| | |
|---|---|
| NEOPOST USA, INC.,<br><br>        Plaintiff,<br>v.<br><br>JOHN MCCABE,<br><br>        Defendant. | 3:11 - CV - 1369 (CSH) |

## RULING ON MOTION FOR TEMPORARY RESTRAINING ORDER

<u>HAIGHT</u>, Senior District Judge:

In this diversity action to enforce a non-compete agreement in a contract of employment, Plaintiff Neopost USA, Inc. ("Neopost") moves for a temporary restraining order ("TRO") against its former employee, Defendant John McCabe ("McCabe"), who left Neopost on July 31, 2011 and accepted employment with non-party Pitney Bowes, Inc., a commercial competitor of Neopost. The TRO sought by Neopost would *inter alia* bar McCabe from working for Pitney Bowes during the pendency of Neopost's companion motions for preliminary and permanent injunctions. Neopost filed its complaint against McCabe on August 30, 2011, and moved for a TRO on September 6. The Court held a hearing on that motion on September 9. The parties submitted affidavits and exhibits, and counsel argued the cause. An assistant general counsel from Pitney Bowes attended and observed the hearing with evident interest but did not participate. At the conclusion of a three-hour hearing, the Court reserved decision on Neopost's motion to restrain McCabe temporarily under Rule 65(b), Fed.R.Civ.P. This Ruling decides that motion.

I.   **BACKGROUND**

Many of the background facts are undisputed. Neopost and Pitney Bowes are manufacturers and distributors of "mailing equipment," a collective noun including but not limited to postage meters, mailing machines, addressing machines, folders, inserters, and software relating thereto. The two companies conduct their business throughout the United States, each organized into regional areas. It is something of an understatement to describe Neopost and Pitney Bowes as competitors in the mailing equipment business; as a practical matter, each company is the other's *only* competitor. Neopost and Pitney Bowes together comprise about 97% of the mailing equipment market in the United States, with Pitney Bowes accounting for about 80% of that national market and Neopost about 17%.[1]

In these particular circumstances, counsel for McCabe argued that "Neopost would be hard-pressed to deny the fact that, number one they hire people *from us* all the time," Tr. 66 (emphasis added), a seeming slip of the advocate's tongue revealing that while procedurally counsel appeared only for McCabe, he recognized Pitney Bowes as his *eminence grise* client. In any event, this *et tu quoque* proposition cannot operate as a defense against Neopost's action against McCabe for allegedly violating a non-compete agreement in his contract with Neopost.

In 2002, McCabe was employed by a company called Neopost, Inc. In February 2005, in connection with a pay raise, McCabe signed a "Disclosure, Assignment, Confidentiality and Non-

---

[1] These market percentages were presented by Neopost's counsel in their supporting memorandum, [Doc. 11-1] at 16, and are based on declarations of present Neopost officers and employees. Defendant's counsel said at oral argument: "I'd argue to you that the percentages may be different, but it may be a fair statement to say that the percentage is darn close to 97 percent or 98 percent of the market place," Tr. 61, a percentage I take to mean the total percentage of the two companies combined.

Competition Agreement" proffered by Neopost, Inc. ("the 2005 Agreement"). In March 2006, in connection with another pay raise and following a corporate reorganization, McCabe executed a second, identically worded Agreement, this time proffered by a corporation called Hasler, Inc. ("the 2006 Agreement"). In November 2009, Neopost, Inc. and Hasler, Inc. were formally merged into the named Plaintiff, Neopost USA, Inc. Plaintiff's affidavits say without contradiction that "as of the time, all of the Hasler and Neopost customers were customers of Plaintiff Neopost."[2]

The 2005 and 2006 Agreements executed by McCabe each contain in ¶ 3 identical language which provides in pertinent part:

> **3. Non-Competition.** For a period of one year from the date of termination of employment, Employee will not directly or indirectly (as a director, officer, partner, employee, manager, consultant, independent contractor, advisor, investor, or otherwise . . . . (i) engage in competition with, or . . . perform any service for, or assist in any way any business conducted by Hasler or any subsidiary or division of Hasler within a radius of fifty (50) miles of any office in which Employee was working at any time during Employee's term of employment; (ii) contact, sell or solicit any customer of Hasler, including but not limited to, any customer of Hasler that Employee had contact with or learned of during his or her employment with Hasler . . . . Employee acknowledges that the above restrictions are reasonable in time and scope and will not materially adversely affect Employee's ability to be employed in his or her general field of expertise.

The only difference between the Agreements is that the references in the 2006 Agreement to "Hasler" read "Neopost" in the 2005 Agreement. Counsel in their arguments refer to subparagraph 3(i) as containing the "geographic restriction" and subparagraph 3(ii) as the "customer restriction."

It is common ground that the last day McCabe reported to a Neopost office (in Burlington,

---

[2] Given the competitive nature of the mailing equipment industry, where presumably a customer can be serviced by one company or the other but not by both at the same time, Pitney Bowes naturally prefers that all Neopost customers become Pitney Bowes customers.

Massachusetts) was August 1, 2011, and that he began working at Pitney Bowes several days later in that month. The present record indicates some disagreement as to whether McCabe resigned from Neopost (as McCabe says) or Neopost fired him (as Neopost says). The question is not material and I do not pursue it. The non-compete agreements are triggered by the "termination of employment" of McCabe by Neopost, whether voluntary or involuntary. The decisive issues are whether the nature of McCabe's employment by Pitney Bowes violates one or both of the geographic or customer restrictions in the Neopost non-competition agreements.

## II. DISCUSSION

I may dispose at the outset of McCabe's seeming contention that he is not bound by the non-compete agreements with Neopost, Inc. (the 2005 Agreement) and Hasler, Inc. (the 2006 Agreement). McCabe reasons that he did not agree that Neopost, Inc. could "transfer or assign my purported agreement to another company"; the 2005 Agreement is silent on that subject, and similar circumstances exist with respect to the subsequent appearances of Hasler and Plaintiff Neopost USA in the corporate chain. McCabe Decl. at ¶¶ 9-15.

There is nothing to this contention. The present record contains no suggestion that these corporate arrangements were anything other than good-faith business reshufflings, unrelated to the present disputes. Conn. Gen. Stat. § 33-820(a)(4) provides: "All property owned by, and every contract right possessed by, each corporation or other entity that merges into the survivor is vested in the survivor without reversion or impairment."[3] The statute immediately vests the predecessor

---

[3] On July 13, 2011, Conn. Gen. Stat. § 33-820 was amended. 2011 Conn. Legis. Serv. P.A. 11-241 § 39 (H.B. 6497) (WEST) (repealing and replacing the current statute effective January 1, 2014). However, other than striking the words, "or other entity", the language of the amended Conn. Gen. Stat. § 33-820 (a)(4) remains virtually identical to that of the current

corporation's rights in the successor corporation "without further act or deed," and its "language is to be construed broadly." *All Brand Importers, Inc. v. Dept. of Liquor Control*, 213 Conn. 199, 200 (1989) (construing earlier statute). That familiar principle extends to non-compete agreements. *See, e.g., Corp. Express Office Products, Inc. v. Phillips*, 847 So.2d 406, 414 (Fla. 2003) ("[W]e conclude that the surviving corporation in a merger assumes the right to enforce a noncompete agreement entered into with an employee of the merged corporation by operation of law, and no assignment is necessary. That is because in a merger, the two corporations in essence unite into a single corporate existence.").

Turning to the criteria for the granting or denial of preliminary relief, by Preliminary Injunction under Rule 65(a) or TRO under Rule 65(b) – the criteria are the same – the Second Circuit recently reiterated them in *Citigroup Global Markets, Inc. v. VGC Opportunities Master Fund Limited*, 598 F.3d 30, 35 (2d Cir. 2010):

> For the last five decades, this circuit has required a party seeking a preliminary injunction to show (a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief. The "serious questions" standard permits a district court to grant a preliminary injunction in situations where it cannot determine with certainty that the moving party is more likely to prevail on the merits of the underlying claims, but where the costs outweigh the benefits of not granting the injunction.

(citations and some internal quotation marks omitted). *Citigroup* explicitly rejected the non-moving party's contention that a trilogy of recent Supreme Court decisions abrogated the alternative "serious questions" standard for granting preliminary relief:

---

statute.

> We have found no command from the Supreme Court that would foreclose the application of our established "serious questions" standard as a means of assessing a movant's likelihood of success on the merits. Our standard accommodates the needs of district courts in confronting motions for preliminary injunctions in factual situations that vary widely in difficulty and complexity. Thus, we hold that our venerable standard for assessing a movant's probability of success on the merits remains valid and that the district court did not err in applying the "serious questions" standard to CGMI's motion.

*Id*. (footnotes omitted). It is of course well settled that a movant under Rule 65(a) (preliminary injunction) or Rule 65(b) (temporary restraining order) must show irreparable harm under either of the two standards. And if the case is evaluated under the "serious questions" standard, the movant ordinarily bears the heightened burden of showing "a balance of hardships tipping decidedly" in its favor.

In the case at bar, at the markedly preliminary stage of a TRO, disputes have arisen against a modest factual record about (1) the existence *vel non* of Neopost's irreparable harm, generally defined to consist of harm that is actual and imminent, not remote and speculative, and not adequately compensable by money damages, s*ee, e.g., Wisdom Import Sales Co., L.L.C. v. LaBatt Brewing Co., Ltd.*, 339 F.3d 101, 113 (2d Cir. 2003); *Jayaraj v. Scappini*, 66 F.3d 36, 39 (2d Cir. 1995); *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir. 1979); and (2) how the balance of hardships should be struck between granting or denying a TRO. The positions staked out by the parties are predictable exercises in advocacy in a non-compete case. Plaintiff Neopost asserts that as the result of McCabe's prior employment with the company, McCabe knows almost everything there is to know about Neopost's proprietary assets, customer identities, and geographic distribution, and will inevitably divulge that knowledge to Pitney Bowes, his new employer, to

Neopost's detriment, unless the non-compete agreements are enforced. McCabe counters that he knows next to nothing about the areas of Neopost's professed competitive concerns, so that the non-complete agreements McCabe executed with Neopost, Inc. and Hasler pleaded in the complaint have no offices to perform and McCabe has not violated them, nor could he do so. Thus the merits of the case turn not upon whether Defendant McCabe entered into those non-compete agreements; clearly he did so, and as I have previously held, those agreements inure to the benefit of the named Plaintiff. Rather, the case asks if McCabe's subsequent conduct as a Pitney Bowes employee violated and continues to violate the non-compete agreements.

The facts probative of McCabe's violation *vel non* are not fully revealed by the present limited record. Presumably they will be explored in detail during mutual discovery prior to the preliminary injunction hearing and at that hearing itself. Depending on how the facts emerge, two special circumstances would arguably apply to Neopost's entitlement to preliminary relief.

Neocast stresses that it is seeking to enforce McCabe's covenant not to compete. Connecticut courts frequently hold that "[t]he standard for granting a temporary injunction to enforce a covenant not to compete, however, is somewhat different in that the plaintiff does not need to prove irreparable harm" and "[t]he standard is also different in that the plaintiff does not have to demonstrate an inadequate remedy at law." *Money Mailer Franchise Corp. v. Wheeler*, No. CV084010066S, 2008 WL 4415942 (Superior Court, Judicial District of Ansonia-Milford, Sept. 16, 2008). Connecticut law governs because Plaintiff Neopost USA, Inc., the successor coorporation to Neopost, Inc. and Hasler, Inc., has its principal place of business in Milford, Connecticut. Complaint [Doc. 1] at ¶ 5. While the 2005 non-compete Agreement between McCabe and Neopost, Inc. provided in ¶ 10 that California law governed, the same paragraph in the 2006 Agreement

7

between McCabe and Hasler, Inc. replaced California law with Connecticut law. During the hearing, counsel for McCabe made some passing references to California law, but I give no further consideration to the law of that state.

McCabe points out that he has been working at Pitney Bowes for over a month without any court-imposed restraining order issued at the behest of Neopost. In consequence, McCabe's argument continues, the TRO for which Neopost now prays should be characterized as a "mandatory" injunction altering the status quo, rather than a "prohibitory" injunction seeking only to maintain it. Mandatory orders "should issue only upon a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial of preliminary relief," *Citigroup*, 598 F.3d at 35 n.4, a burden McCabe contends Neopost has failed to carry on the present record.

Considering the facts presently revealed in the light of the applicable rules of law, I conclude that Plaintiff Neopost has crafted a suitably tailored and narrow request for a TRO to protect Neopost for a reasonable period of time from likely and plausible harm that may result from Defendant McCabe's violation of those non-compete agreements to which McCabe consented while a Neopost employee and before switching to Pitney Bowes, Neopost's primary competitor in a competitive business. It is reasonable to infer, even in the present paucity of direct proof other than McCabe's generally phrased denials in his declaration, that while McCabe was employed by Neopost (his last position was District Sales Manager for portions of the New England territory), McCabe acquired knowledge or awareness of that company's customers and proprietary business practices that fall within the geographic and customer restrictions of the non-compete agreements, and that McCabe would be inclined to share that information with Pitney Bowes, his new employer, where his

8

"specific job is to help Pitney Bowes reclaim customers that it lost in previous years to other competitors in the mailing industry, including Neopost." McCabe Declaration at ¶ 64. In the United States mailing industry of today, Pitney Bowes and Neopost are the *only* economically meaningful competitors.

Given the nature of the interests protected by a non-compete agreement and the principles articulated in a case such as *Money Mailer*, 2008 WL 4415942, Neopost is entitled to a properly crafted TRO. Counsel for McCabe argued at the hearing that McCabe had no knowledge, means or prospects of violating the specific promises he made in the non-compete agreements and which Neopost sues to enforce, nor was he in a position to violate them. Accepting McCabe's disclaimers at face value, it is difficult to discern why he opposes the TRO, or why Pitney Bowes would fire McCabe if the Court enters it, which McCabe professes to fear. While the TRO the Court will enter tracks the language of the non-compete agreements, that does not render the TRO no more than legal repetition. The promises McCabe made to Neopost in the agreements take on the new and enhanced form of an Order of the Court, with penalties for contempt in the event of proved non-compliance available to Neopost against McCabe and, conceptually at least, against Pitney Bowes as well, since in addition to the parties in litigation and their officers and attorneys, "other persons who are in active concert or participation" with the parties are bound by injunctions and restraining orders. Rule 65(d)(C).

### III. CONCLUSION

For the foregoing reasons, the Court will enter a TRO against McCabe in a separate Order filed with this Ruling. The Order will take effect upon the posting by Plaintiff pursuant to Rule 65(c)

9

of security in a form acceptable to the Court and the Clerk in the amount of $50,000. Plaintiff offered security of $5,000 and Defendant asked for $500,000. Both figures are fanciful. Security under the Rule is intended to protect a non-moving party against damages resulting from an injunction eventually held to have been improvidently made. A district court must take care in fixing the amount of security because it places a cap upon a wrongfully restrained party's recoverable damages, *Interlink International Financial Services, Inc. v. Block*, 145 F.Supp.2d 312, 314 (S.D.N.Y. 2001) (citations omitted), and while the court must necessarily exercise its discretion in arriving at a reasonable estimate, $5,000 in this case is inadequate. However, at the hearing McCabe's counsel seemed to suggest (perhaps immodestly) that $500,000 was necessary to secure McCabe for attorneys' fees he would incur as the case went forward. That suggestion is without substance because in the Second Circuit, "[c]onsistent with this general rule against fee-shifting, it has long been established that a prevailing party may not generally collect as damages against an injunction bond attorneys' fees in litigating the injunction," as opposed to "fees and expenses that it incurred in complying with the injunction," which are recoverable against the bond. *Nokia Corp. v. Interdigital, Inc.*, 645 F.3d 553, 560 (2d Cir. 2011).

Further Orders for expedited discovery and the dates of a hearing on Plaintiff's motion for a preliminary injunction will also be entered.

It is SO ORDERED.

Dated: New Haven, Connecticut
September 19, 2011

               /s/ *Charles S. Haight, Jr.*
               Charles S. Haight, Jr.
               Senior United States District Judge